# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CLIFFORD WAYNE MILLER,

    Plaintiff

v.

MICHAEL MINEV, et al.,

    Defendants

Case No.: 3:23-cv-00040-CSD

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 47

Before the court is Defendants' motion for summary judgment. (ECF Nos. 47, 47-1 to 47-15, 50-1 to 50-2 (sealed).) Plaintiff filed a response. (ECF No. 57.) Defendants filed a reply. (ECF No. 59.)

After a thorough review, Defendants' motion for summary judgment is granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this civil rights action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 6.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC), Lovelock Correctional Center (LCC), and Warm Springs Correctional Center (WSCC). (*Id.*)

The court screened Plaintiff's complaint and allowed him to proceed on an Eighth Amendment claim for deliberate indifference to serious medical need claim against John Scott, Portia Hutchinson, Candis Rambur, Dr. Michael Minev, Kerry McCullah, and Dr. Joseph Benson. (*See* ECF No. 7.) During a case management conference, the court granted Plaintiff's

oral motion to voluntarily dismiss Scott, Hutchinson, and Rambur. (ECF No. 30.) Thus, the case is proceeding only against Minev, McCullah, and Benson.

Plaintiff alleges that Minev knew he was experiencing severe head pain from shrapnel and a broken plate in his skull but failed to act to ensure Plaintiff received appropriate medical care, causing him to suffer continued pain. Plaintiff alleges that McCullah ignored his requests for a CT scan, which also prolonged his pain. Finally, Plaintiff alleges that Benson failed to provide medical care after informing Plaintiff that the shrapnel in his head was causing lead poisoning and failed to provide Plaintiff with the results from his CT scan. (*See* ECF No. 7.)

Defendants now move for summary judgment on the grounds that: (1) Minev did not personally participate in Plaintiff's medical care; (2) Defendants are entitled to qualified immunity; (3) Defendants were not deliberately indifferent to Plaintiff's medical needs; (4) Plaintiff's claim that Benson failed to show him the CT scan results is moot; and (5) Plaintiff's claims are procedurally barred by the Prison Litigation Reform Act (PLRA) for failure to exhaust his available administrative remedies. (*See* ECF No. 47.)

Plaintiff opposed the motion. (ECF No. 57.) First, Plaintiff argues the defense of qualified immunity is unconstitutional. (*Id.* at 2-6.) Plaintiff next argues the NDOC's Administrative Regulation governing administrative remedies, AR 740, was improperly implemented but nonetheless, he did exhaust his claims. (*Id.* at 6-8.) Finally, Plaintiff argues there are genuine disputes of material fact that preclude summary judgment. (*Id.* at 8-10.)

Defendants replied, arguing Plaintiff is incorrect in alleging that qualified immunity is unconstitutional, that AR 740 is required pursuant to NRS 233B, and that he exhausted his administrative remedies. (ECF No. 59.) Defendants further argue that Plaintiff failed to oppose

their arguments as to Minev's personal participation, Defendants' deliberate indifference to Plaintiff's serious medical needs, or that the CT scan claim is moot. (*Id.*)

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party is not significantly probative, summary judgment may be granted." *Anderson,*

477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

*Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

*Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party

cannot establish an element essential to that party's case on which that party will have the burden

of proof at trial. *See Celotex*, 477 U.S. at 323-25.

If the moving party satisfies its initial burden, the burden shifts to the opposing party to

establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Legal Standard**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104).

Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

1    If the medical need is "serious," the plaintiff must show that the defendant acted with

2    deliberate indifference to that need. *Estelle*, 429 U.S. at 104. "Deliberate indifference is a high

3    legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference

4    entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by

5    itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at

6    1060. Instead, deliberate indifference is only present when a prison official "knows of and

7    disregards an excessive risk to inmate health or safety; the official must both be aware of the

8    facts from which the inference could be drawn that a substantial risk of serious harm exists, and

9    he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

10    Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally

11    interfere[s] with medical treatment, or it may be shown by the way in which prison officials

12    provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal

13    quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely

14    denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v.

15    McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on

16    other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving

17    medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury.

18    *Stewart v. Aranas*, 32 F.4th 1192, 1195(9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison

19    Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)); *McGuckin*, 974 F.2d at 1060.

**B. Facts**

21    On May 11, 1999, Plaintiff underwent surgery for a gunshot wound to the head. (ECF

22    No. 50-1 at 28-35 (sealed), ECF No. 47-12.) To repair the damage, doctors removed bullet

23    fragments from his head and inserted plates and screws into his skull. (ECF No. 50-1 at 28-35

(sealed).) On November 6, 2001, Plaintiff entered the custody of the NDOC. (ECF No. 47-1 at 2, ECF No. 47-15.)

On February 13, 2019, Plaintiff submitted a kite requesting a CT scan stating he had previously requested one but had never been seen by a provider. (ECF No. 47-5 at 24, ECF No. 47-12.) The response indicates Plaintiff was seen by medical on March 21, 2019. (ECF No. 47-5 at 24.)

On December 12, 2019, Plaintiff submitted a kite complaining about sharp pain in the bridge of his nose. (ECF No. 47-5 at 23.) Plaintiff was seen by medical two days later. (ECF No. 50-1 at 45 (sealed).) On January 29, 2020, NDOC Nurse Hutchinson submitted a request form to the Utilization Review Panel (URP), citing Plaintiff's request for a CT scan to determine if the plate in his skull, which he believed to be plastic, was broken and concerns regarding the pain he was experiencing. (*Id.* at 44.) The URP authorized Plaintiff to receive an x-ray, rather than a CT scan. (*Id.*)

On March 6, 2020, Plaintiff underwent a skull x-ray which found that his cranial plate was held in place by an "intact appearing *metal* plate and screw devices." (ECF No. 50-1 at 46 (emphasis added) (sealed).) The x-ray findings further note the presence of "buttressing *metal* plate and screw devices" that "appears intact without loosening." (*Id.* (emphasis added).) The impressions from the exam were that the hardware appears intact and well placed. (*Id.*) On March 19, 2020, Plaintiff submitted a medical kite requesting URP approval for a CT scan. (ECF No. 47-5 at 20.)

On May 4, 2020, Plaintiff submitted informal grievance number 2006-31-00707 (Grievance No. 00707), claiming his Eighth Amendment rights were being violated because NDOC was refusing to treat the broken plate in his skull and shrapnel in his brain and refusing to

allow him to see an outside neurologist for a CT scan. (ECF No. 47-6 at 11, ECF No. 47-15.)

McCullah responded on May 15, 2020, denying the grievance because the URP decided to order

x-rays to determine if the hardware was loose or had moved, and the x-ray results from March 6,

2020, showed that the hardware "appeared intact and well placed." (ECF No. 47-6 at 12.)

Plaintiff filed a first level grievance on May 28, 2020, reiterating the claims in his informal

grievance. (*Id.* at 13.) The grievance was again denied because the x-ray showed that the metal

plates in his skull were intact, and there was nothing indicated that would require Plaintiff to be

seen by a neurologist. (*Id.* at 14.) On June 22, 2020, Plaintiff filed a second level grievance. (*Id.*

at 15.) Although assigned to Minev, the official response stated that a CT scan was ordered by

Dr. Naughton on November 10, 2021. (*Id.*)

On July 21, 2021, Plaintiff submitted informal grievance 2006-31-24706 (Grievance No.

24706), stating that his second level grievance for Grievance No. 00707 had not been responded

to as required. (*Id.* at 4.) Plaintiff then submitted a first level grievance stating that NDOC did

not timely respond to the informal grievance. (ECF No. 47-7 at 14-16, ECF No. 47-15.) The

response to the grievance indicated that Plaintiff did not submit the required documentation

relating to the previous grievance, and he would have to resubmit the first level grievance. (ECF

No. 47-7 at 13.) On October 10, 2021, Plaintiff did so. (*Id.* at 10.)

On November 9, 2021, Dr. Naughton requested, and the URP authorized, a CT scan of

Plaintiff's skull and brain. (ECF No. 50-1 at 3 (sealed).) On November 17, 2021, Plaintiff signed

a release of liability form for refusal of health care, stating "I wish to wait until the COVID

Quarantine Protocol has been lifted before going out for my CT scan." (*Id.* at 2, 20.) During this

period of time, inmates who left and reentered the facility were required to quarantine for a

minimum of fourteen days. (ECF No. 47-9 at 3.)

On December 15, 2021, the first level grievance for Grievance No. 24706 was denied because Plaintiff had been scheduled for a CT scan but he refused, and future medical care regarding this issue could not occur until he underwent a CT scan. (ECF No. 47-7 at 9.) The next day, Plaintiff filed a second level grievance for Grievance No. 24706, stating that his grievance had still not been resolved because he had not received a response to his second level grievance for Grievance No. 00707. (*Id.* at 2-4.) On January 16, 2022, Minev responded to the second level grievance for Grievance No. 0024706, stating that because Plaintiff's request for a CT scan was granted, ordered, and scheduled but Plaintiff refused to have the test completed, the grievance had been resolved. (ECF No. 47-6 at 7.)

On March 2, 2022, Plaintiff submitted a medical kite asking if the Covid-19 quarantine protocols had been dropped and if so, whether he could be rescheduled for a CT scan. (ECF No. 47-5 at 17.) Plaintiff also submitted a second, undated, kite with the same requests. (*Id.* at 18.) McCullah responded, noting Plaintiff's previous refusal to receive the CT scan but stated that he would be rescheduled. (*Id.*)

On May 17, 2022, Plaintiff was again ordered for a CT scan. (ECF No. 50-1 at 11 (sealed).) On June 23, 2022, NDOC requested the CT scan, which was approved by the URP on July 27, 2022. (*Id.* at 14.) In her declaration, McCullah stated that Plaintiff's CT scan was approved less than two months after his kite was responded to, which is an average length of time for such a request. (ECF No. 47-10 at 6.) Plaintiff underwent the CT scan on August 26, 2022. (ECF No. 50-1 at 43 (sealed).) The exam found no acute intracranial pathology or traumatic injury. (*Id.*)

On September 12, 2022, NDOC noted that Desert Radiology, where Plaintiff underwent the CT scan, needed to be contacted for the results of the scan. (*Id.* at 8.) On December 30, 2022,

Plaintiff submitted a kite requesting the results of his CT scan. (ECF No. 47-5 at 12.) Plaintiff submitted another kite requesting the CT scan results on April 28, 2023. (*Id.* at 8.) As of June 29, 2023, NDOC had still not received the CT scan results, despite submitting additional release of information forms to Desert Radiology so NDOC could receive the results. (ECF No. 50-1 at 18 (sealed).)

On September 14, 2023, medical staff ordered Plaintiff to receive lab tests for lead levels, among others. (*Id.* at 17.) The results were returned on October 6, 2023. (*Id.* at 62-63.) In his declaration, Benson states that although he does not recall meeting with Plaintiff, he reviewed Plaintiff's lab results for lead toxicity. (ECF No. 47-11 at 3.) Benson states the amount of lead identified in Plaintiff's blood was just above the test's detectable lower limit. (*Id.*)

On September 18, 2023, Dr. Benson reviewed Plaintiff's CT scan and found that multiple small plates were present in Plaintiff's skull as well as bullet fragments but did not indicate whether the plates were loose. (ECF No. 50-1 at 55 (sealed).) On the same day, NDOC medical staff ordered another CT exam of Plaintiff's head/brain. (*Id.* at 21-23, 52-53.)

On October 30, 2023, the Director of Nursing reviewed Plaintiff's CT scan with him and indicated Plaintiff had already reviewed the results with a provider a month earlier. (ECF No. 47-8 at 2, ECF No. 47-14.)

Plaintiff received a second CT scan on May 3, 2024. (ECF No. 50-1 at 62 (sealed).) On July 19, 2024, Plaintiff underwent an x-ray of his skull. (*Id.* at 49.) The x-ray showed fixation hardware on his skull but did not indicate that the hardware is loose in any fashion. (*Id.*)

**C. Analysis**

The court will first evaluate Defendants' arguments relating to personal participation before turning to the merits of Plaintiff's claims. Each Defendant will be discussed in turn.

**1. Minev**

Defendants argue that Minev did not personally participate in any alleged constitutional violation such that he would be liable under 42 U.S.C. § 1983. (ECF No. 47.) "42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation[.]" *Id*. (citations omitted). In other words, the plaintiff "must show that each defendant personally played a role in violating the Constitution." *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019), *cert. denied sub nom., Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019) ("inmates must show that each defendant personally played a role in violating the constitution."). "An official is liable under § 1983 only if 'culpable action, or inaction, is directly attributed to them.'" *Id*. (quoting *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)).

In addition, "[u]nder section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.'" *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012) (en banc) (quoting *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989)). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Snow,* 681 F.3d at 989 (quoting *Hansen*, 885 F.2d at 646).

The causal connection can include: "1) [the supervisor's] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous

11

indifference to the rights of others." *Lemire v. Cal. Dep't of Corr.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (citations and internal quotation marks omitted). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Id.* (citing *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (Apr. 30, 2012)) (internal quotation marks omitted).

The court allowed Plaintiff to proceed against Minev based on allegations that Minev knew of, but failed to respond to, Plaintiff's medical needs. (ECF No. 7 at 7-8.) Specifically, in or around September 2020, Plaintiff alleges he submitted a kite to Minev, as the NDOC Medical Director, requesting a response to his second level grievance for Grievance No. 00707. (*Id.*) Plaintiff alleges this was sufficient to establish Minev was aware of his medical needs and therefore should have acted. (*See* ECF No. 6.)

Defendants argue that Minev did not personally participate in any alleged violations because Minev did not review or respond to Plaintiff's grievance about his medical care. (ECF No. 47 at 10-12.) Defendants point to Plaintiff's kite history, which does not have any records of Plaintiff sending a kite addressed either to Minev or the NDOC Medical Director between August and October 2020. (ECF No. 47 at 10-12.) Additionally, Defendants provide evidence showing that while the second level grievance for Grievance No. 00707 was originally assigned to Minev, the response was actually provided by Dr. Naughton, who is not a party in this case. (*Id.*) Defendants argue that the one grievance to which Minev did respond concerned only a failure to respond to a previous grievance, not Plaintiff's actual medical needs. (ECF No. 59 at 2-3.)

1        "Holding a prison official personally responsible for damages simply because he is

2 familiar with a prisoner's circumstances through direct communications with the prisoner and

3 through communications with his subordinates is such a broad theory of liability that it is

4 inconsistent with the personal responsibility requirement for assessing damages against public

5 officials in a 42 U.S.C. § 1983 suit." *May v. Williams*, No. 2:10-cv-00576-GMN-LRL, 2012 WL

6 1155390, at *3 (D. Nev. Apr. 4, 2012) (citing *Crowder v. Lash,* 687 F.2d 996, 1005–1006 (7th

7 Cir.1982)). Courts have also held that "merely denying a grievance without some decision-

8 making authority or ability to resolve the underlying issue grieved is not enough to establish

9 personal participation." *Jackson v. Nevada*, No. 2:16-cv-00995-APG-NJK, 2019 WL 6499106, at

10 *7 (D. Nev. Dec. 3, 2019), *aff'd*, No. 20-15007, 2022 WL 16756349 (9th Cir. Nov. 8, 2022)

11 (citation omitted).

12        In this case, the only grievance to which Minev responded did not directly concern

13 Plaintiff's medical needs. Rather, the grievance was focused on not receiving a response to a

14 previous grievance. Thus, this grievance constituted, at best, a communication with Minev that

15 indirectly made Minev aware of Plaintiff's medical needs. As simply being familiar with an

16 inmate's circumstances is insufficient to support a § 1983 claim, *May*, 2012 WL 1155390, at *3,

17 Defendants have satisfied their burden on summary judgment. *Celotex*, 477 U.S. at 323-25.

18        The burden now shifts to Plaintiff to provide evidence to establish a genuine dispute of

19 material fact. *Matsushita*, 475 U.S. at 586. Here, Plaintiff does not provide any evidence and

20 merely states that he has met his burden of presenting triable facts. (ECF No. 57 at 9.)  As the

21 nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

22 that are unsupported by factual data, Defendants' motion for summary judgment is granted as to

23 Minev. *Matsushita*, 475 U.S. at 587.

### 2. McCullah

The court allowed Plaintiff to proceed against McCullah based on allegations that she ignored Plaintiff's kite requesting a CT scan, which prolonged his pain. (ECF No. 7 at 8.) Defendants provide evidence showing that McCullah responded to Plaintiff's kites and scheduled appointments or procedures promptly. When Plaintiff sent a kite requesting a CT scan in February 2019, McCullah responded the next day, and Plaintiff was seen by a provider for the issues the next month. (ECF No. 47-5 at 24.) In December 2019, Plaintiff submitted another kite relating to pain in his head and was seen by medical two days later and scheduled for a more thorough exam the following month. (*Id.* at 23, ECF No. 50-1 at 45 (sealed).)

After refusing the CT scan due to quarantine protocols, McCullah promptly rescheduled Plaintiff for a CT scan after he sent a kite indicating he would now like to undergo the scan. (ECF No. 47-5 at 17-18, ECF No. 47-10 at 6.) This constitutes sufficient evidence to show that McCullah did not ignore Plaintiff's requests for a CT scan, but rather affirmatively took steps to first schedule, and then reschedule, the exam and was therefore not deliberately indifferent to Plaintiff's medical needs. *Crowley*, 734 F.3d at 978. Thus, Defendants have met their burden on summary judgment and the burden shifts to Plaintiff to establish a genuine dispute of material facts. *Celotex*, 477 U.S. at 323-25.

Here, Plaintiff does not provide evidence that McCullah either delayed or interfered with his medical care. Plaintiff does not even mention McCullah in his opposition to Defendants' motion for summary judgment. (*See* ECF No. 57.) Besides stating that he has provided triable issues of fact, Plaintiff also does not argue how the treatment he did receive was inadequate or lacking in any manner. Consequently, Plaintiff has failed to establish a genuine dispute of

material fact, and Defendants are entitled to summary judgment as to McCullah. *Matsushita*, 475 U.S. at 587.

### 3. Benson

Plaintiff was allowed to proceed against Benson based on allegations that he failed to provide Plaintiff with any medical care after telling Plaintiff that the shrapnel in his head was causing lead poisoning and failed to provide Plaintiff results from his CT scan. (ECF No. 7 at 8.) Turning first to the issue of shrapnel in Plaintiff's head causing lead poisoning, the evidence in the record shows that Plaintiff was tested for lead poisoning. (ECF No. 50-1 at 17 (sealed).) The testing revealed that Plaintiff's lead levels were almost below the lowest detectable limit, meaning his lead levels were so low they almost did not show up on the test at all. (*Id.* at 62-63, ECF No. 47-11 at 3.) Therefore, Plaintiff was tested for potential lead poisoning, and the tests revealed that he did not need any further medical care because the levels were so low.

Next, Defendants argue they are entitled to summary judgment as to Benson because NDOC could not force Desert Radiology to provide the CT scan results. (ECF No. 47 at 17-18.) Defendants provide evidence showing they made diligent efforts to receive the results from Desert Radiology, including following up to request the results and submitting multiple release of information authorization forms to prompt Desert Radiology to transmit the results. Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment," and there is no such behavior on behalf of NDOC employees in this situation. *Crowley*, 734 F.3d at 978. The evidence in the record shows that once NDOC received the results from Desert Radiology, the results were reviewed with Plaintiff more than once. (ECF No. 47-8 at 2.) Defendants have thus provided evidence to show that Benson was not

deliberately indifferent to Plaintiff's medical care relating to lead poisoning and CT scan results and thus have met their burden on summary judgment. *Celotex*, 477 U.S. at 323-25.

Turning to Plaintiff's burden, he must provide evidence to establish a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586. As stated previously, Plaintiff does not provide any evidence to support his allegations other than to conclude that he has asserted triable issues of fact. (*See* ECF No. 57.) Consequently, Plaintiff has not met his burden on summary judgment and Defendants are entitled to summary judgment as to Benson.[1] *Matsushita*, 475 U.S. at 587.

### IV. CONCLUSION

IT IS HEREBY ORDERED that the Defendants' motion for summary judgment (ECF No. 47) is granted in its entirety.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

Dated: April 11, 2025

_____
Craig S. Denney
United States Magistrate Judge

---

[1] As the motion for summary judgment can be resolved on the issues discussed above, the court will not examine Defendants' arguments on qualified immunity, mootness, or exhaustion.

16